# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

|  |  |
|---|---|
| COALITION FOR WORKFORCE INNOVATION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 1:21-CV-130 ) |
| JULIE A. SU, et al., | ) ) ) |
| Defendants. | ) ) ) ) ) ) |

## BRIEF OF *AMICUS CURIAE*

### FILED BY THE SOCIETY FOR HUMAN RESOURCE MANAGEMENT AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS MOTION FOR SUMMARY JUDGMENT

Scott P. Mallery (CA Bar. No. 283562)
(To be admitted *pro hac vice*)
Seyfarth Shaw LLP
400 Capitol Mall, Suite 2300
Sacramento, CA 95814

Richard Lapp (IL Bar No. 6191534;
CA Bar No. 271052)
(To be admitted *pro hac vice*)
Seyfarth Shaw LLP
233 S Wacker Dr # 8000
Chicago, IL 60606

Scott Hecker (NY. Bar No. 4417309;
D.C. Bar No.: 1723692)
(To be admitted *pro hac vice*)
Seyfarth Shaw LLP
975 F Street, NW
Washington, DC 20004

Linda C. Schoonmaker
Texas Bar No. 17806300
Seyfarth Shaw LLP
700 Milam Street, Suite 1400
Houston, TX 77002

*Counsel for Amicus Curiae*

## *AMICUS CURIAE* SOCIETY FOR HUMAN RESOURCE MANAGEMENT'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Society for Human Resources Management ("SHRM") files this brief as *Amicus Curiae* in support of the Plaintiffs' motion for summary judgment.

### I.
### INTRODUCTION: IDENTITY AND INTEREST OF *AMICUS CURIAE*

As the trusted authority on all things work, SHRM is the foremost expert, researcher, advocate, and thought leader on issues and innovations impacting today's evolving workplaces. With nearly 340,000 members in 180 countries, SHRM touches the lives of more than 362 million workers and their families globally. Our members understand that to recruit and retain top talent, organizations must offer myriad options that provide modern workers the autonomy they desire. To compete in the modern global work environment, providing independent work opportunities is not only valuable but also necessary.

To these ends, SHRM opposes the U.S. Department of Labor's ("DOL" or "Department") 2024 regulation entitled "Employee or Independent Contractor Classification Under the Fair Labor Standards Act," which makes it more difficult to classify individuals as independent workers by tipping the scale to such a degree so that all workers, regardless of whether traditionally viewed as employees or not, are now classified as employees. This hinders economic participation and growth.

Given its unique workplace knowledge and its economic posture, SHRM has a significant and immediate interest in this litigation. SHRM represents professionals attuned to the "on-the-ground" implications of agency rulemaking. More specifically, SHRM represents HR professionals who must engage with the contours — or lack thereof — of the new Rule to ultimately render impactful and complicated classification decisions. These decisions can lead to high-stakes litigation, so SHRM's members — and indeed all economic stakeholders — benefit from a clear standard governing the classification of workers, such as that provided in the 2021

Rule; the unclear nature of the 2024 Rule, conversely, is detrimental to SHRM members simply doing their jobs.

Not only does *Amicus* provide a unique point of view as an advocate for HR professionals, but the 2024 Rule also affects SHRM as an employer in its own right, as SHRM often uses the excellent work of independent contractors. Therefore, SHRM — uniquely — both *represents* and *is part of* the regulated community.

## II.

## SUMMARY OF AMICUS

Through this brief, SHRM will detail why the diverse organizations and companies SHRM represents agree this Court should grant the Coalition for Workforce Innovation (CWI's) motion for summary judgment to reinstate the 2021 Rule. HR professionals are charged with numerous indispensable responsibilities, including — and most pertinent here — deciding whether a worker will be classified as an independent contractor or employee. In rendering such difficult decisions, the premium HR professionals place on the clarity and certainty of the rules governing these difficult decisions — as well as the import of the impacts that flow from these classification determinations — cannot be overstated.

SHRM supported the DOL's previous regulation of Independent Contractor Status under the Fair Labor Standards Act ("FLSA"), published on January 7, 2021, because it drew clear corners to evaluate worker classification. By instructing courts on which predominant factors to focus, the previous rule provided clarity, certainty, and consistency. The 2024 Rule, unfortunately, does not provide the same certainty or clarity, but rather accomplishes the opposite: the balancing test established by the 2024 Rule is not only less certain than the 2021 Rule, but it is also less certain than the DOL Rule in place prior to the promulgation of the 2021 Rule.

SHRM's concerns with the 2024 Rule stem from the regulation's failure to account for the increasingly complex, modern economy that necessitates independent work. Members of every generation are choosing independent work: nearly 50 percent of Generation Z and 44 percent of

Millennials engage in some form of independent work; yet, as described in more detail below, the 2024 Rule favors an employee classification, even if the worker prefers independent work.

SHRM's apprehension stems from a concern that businesses will forgo providing independent workers with beneficial safety or anti-harassment training due to the risk of being deemed to have exerted too much control over these workers. In other words, the 2024 Rule disincentivizes employers from providing certain benefits and training out of fear of, e.g., class-action lawsuits alleging misclassification of workers and the severe penalties that can accumulate from allegedly incorrect classifications.

HR professionals used an abundance of resources to prepare to execute classification decisions under the 2021 Rule. Then, the DOL improperly withdrew the Rule before HR Professionals had the chance to engage with it and before the DOL could evaluate the Rule's success. SHRM agrees with the Court's earlier conclusion that the Rule's withdrawal and replacement was arbitrary and capricious.

Finally, in its press release announcing the effective date of the new rule, the DOL noted that it will "help employers and workers better understand when a worker qualifies as an employee" and "provides guidance on proper classification" by allegedly "restor[ing] the multifactor analysis used by courts for decades." But that is simply not what the 2024 Rule accomplishes; in fact, it accomplishes the opposite.

In light of its representation of professionals who make classification decisions that bear serious legal implications, SHRM focuses its comments, for the most part, on the practical implications of the new rule, rather than the legal arguments addressed in other briefing, e.g., CWI's.

In addition to its representation of HR Professionals, SHRM also submits this *amicus* brief from its perspective as a member of the regulated community. Indeed, Like many organizations, SHRM leverages independent workers to obtain specific skills, talent and knowledge, that are not related to the day-to-day operations/functions of the organization but are an essential part of the success of the organization. The 2024 Rule threatens SHRM's utilization of such specialized work.

## III.

## **BACKGROUND ON IMPORTANCE OF INDEPENDENT WORK**

### A.   **Independent Work Is Here To Stay And Employers Need Consistent Rules**

From October 18, 2022, to November 1, 2022, SHRM conducted an electronic survey of 956 randomly-sampled HR professionals from active SHRM members and 1,018 independent workers from a third-party online panel. *See* DOL Independent Contractor Ruling Survey Results (2022 Survey), attached as Exhibit (Ex.) A at pp. 1-2. SHRM specifically geared the 2022 Survey's questions toward the DOL's then-proposed, now-final "totality of circumstances" standard for classifying independent workers. The 2022 Survey found that nearly 75 percent of respondents' organizations utilize independent workers. *Id.* Further, independent workers are most satisfied with the *flexibility* independent work offers, such as (a) the location(s) they can work, (b) their working schedules, (c) control in setting their schedules, and (d) choosing the type of work they perform.

Additionally, SHRM conducted a survey of independent contractors, employees, managers, and HR professionals in April 2019 in collaboration with SAP Success Factors (2019 White Paper) about independent contractor classification and the benefits of independent work for businesses and workers. Specifically, the research surveyed 940 independent contractors (external workers), 350 employees (internal workers), 424 managers who work with external workers, and 1,175 HR professionals in a broad variety of sectors, industries, organizational sizes, and geographic areas in the United States.[1] *See* 2019 White Paper, attached as Exhibit B at pp. 6, 10-12. The Paper found independent workers have a variety of reasons for engaging in external work. The most cited reasons for becoming an independent worker were "being able to set my own schedule" (49%), "choosing how many hours I work" (40%), and "choosing my work location" (33%). *See id.* at p. 18; *see also* Ex. A at pp. 10-11. In other words, workers choose independence because of its *flexibility.*

---

[1] Independent contractors, employees, and managers were sourced from National Opinion Research Center's national representative AmeriSpeak® Panel.

310609877v.1

The primary concern voiced by HR professionals is the **need for clarity and specificity** around independent contractor classification. In 2019, nearly three-quarters of HR professionals reported they were somewhat concerned, concerned, or very concerned about the legal landscape of external work, with 11 percent reporting that they were very concerned. *See* Exhibit B at p. 39. When asked to identify the biggest issue or challenge they would like to see resolved related to external workers, many HR professionals cited **legal ambiguity** regarding the use and management of external workers as their greatest concern; the 2024 Rule embodies the same legal ambiguity our members are most concerned over.

The 2021 Rule alleviated ambiguity concerns by restricting the classification test to focus initially on two core factors. However, the 2024 Rule offers a return to legal limbo for HR professionals. It is SHRM members, i.e., these HR professionals, who must render these decisions, and the 2024 Rule will, in most scenarios, require these decision-makers to have difficult conversations with workers who prefer independence that they must be categorized as employees.

**B.     The Rule Dissuades Employers From Offering Training Or Benefits**

SHRM is concerned with an organization's ability to assist not only employees of a given member company, but also any workers properly classified as independent contractors. Doing so ensures the success and well-being of all workers, employees, independent workers, and our nation's economy as a whole. While many independent workers do not want the "employee" designation, and the lack of flexibility that classification entails, those same workers undoubtedly benefit from certain training and select benefits; however, the 2024 Rule hinders such progressive training and benefits.

While more workers choose independence, the fear of misclassification may reduce[2] their opportunity to receive helpful workplace training or benefits like paid sick leave or safety training. Only 17 percent of those workers surveyed in 2022 said they would *not* be interested in additional benefits, while 65 percent said they would. In fact, nearly two-thirds of independent workers

---

[2] See Pophal-Grensing, Lin, *When Gig Workers Want Benefits, Should You Offer Them?* July 25, 2019, *available at* https://www.shrm.org/topics-tools/news/benefits-compensation/gig-workers-want-benefits-offer.

indicated a slight interest in additional benefits, even if meant accepting a lower pay rate. SHRM suggests that the 2024 Rule should have clarified that businesses can offer training and benefits without disrupting the independent worker's classification.

### C. The Rule Is Detrimental to SHRM as a Member of the Regulated Community

As noted above, in order for SHRM to accomplish its purposes of representing HR Professionals and supporting all workers, regardless of classification, it must utilize independent work that is not necessarily in direct relation to the day-to-day operations of the organization, but the 2024 Rule could render these workers employees. Examples of such necessary functions include, but are not limited to:

- **Media/Audio-visual skills** – SHRM has increased its public-facing profile, which requires more advanced media/audiovisual skills for webcasts, video messaging, and televised commercials.

- **Academic professions** – As the trusted authority on all things work, SHRM leverages expertise from thought leaders on issues and innovations impacting today's evolving workplaces, which includes academic professionals from the world's leading institutions.

- **Events management expertise** – as a global organization with nearly 340,000 members in 180 countries, SHRM connects and educates its members through live and virtual conferences all over the United States and the world, e.g., this year SHRM's Annual Conference & Expo will be held in Chicago; SHRM's Tech24 Conference & Expo will be held in Hyderabad, India in May; and SHRM's GGC HR Summit will be held in Dubai in June. Due to the geographic location of these conferences, SHRM leverages local skills and event management talent in an event's specific location to ensure a successful and culturally-aligned conference.

The 2024 Rule upends SHRM's classification of the 100 independent workers it currently utilizes.

### IV.

### ARGUMENT

#### A. SHRM Supported The 2021 Rule's Stable Interpretation

The 2021 Rule recognized the longstanding significance of the economic realities test and that its elements date back to the United States Supreme Court's decision in *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 728 (1947) and the subsequent decision in *Nationwide Mut. Ins. Co. v.*

8

*Darden,* 503 U.S. 318, 324-326 (1992), which together provided that the scope of employment under the FLSA is determined by the economic reality of the relationship at issue. The 2021 Rule addressed Judge Frank H. Easterbrook's criticism that the economic realities test "is unsatisfactory both because it offers **little guidance for future cases** and because any balancing test begs questions about which aspects of 'economic reality' matter and why." *Sec. of Labor v. Lauritzen,* 835 F.2d 1529, 1539 (7th Cir. 1988) (Easterbrook, J. concurring) (emphasis added).

By designating core factors for consideration, the 2021 Rule provided clear direction, permitting HR professionals to prioritize certain factors — the nature and degree of control over the work and the worker's opportunity for profit or loss — when analyzing worker classifications. Indeed, the majority of HR professionals polled by SHRM in 2022 (61%) identified "[t]he nature and degree of control the worker has over the terms and conditions of their employment" as the most important factor in the classification analysis. This aligns with the 2021 Rule's focus on control as a core factor. Ex. A at p. 3. The 2021 rule was simply a better reflection of the kinds of guidance that HR professionals rendering these classification decisions need to perform their tasks with consistency.

The 2024 Rule provides none of the same certainty. Comprehensive consideration of the various factors set forth in the 2024 Rule requires HR professionals to speculate on how the DOL or a court may interpret each individual criterion *ad hoc.* This will inevitably result in inconsistencies in its application. The resulting confusion will lead to continued uncertainty for employers and workers.

Instead of promulgating a new and confusing rule, the DOL would have better served the economic stakeholders — including workers — by providing additional guidance on the 2021 Rule and by allowing HR professionals the time to analyze and engage with the 2021 Rule to determine whether a worker is or is not an employee. The withdrawal and replacement of the rule prior to permitting businesses to engage with the 2021 Rule and DOL to analyze the framework's effectiveness was arbitrary and capricious.

///

B. **Withdrawal Of The 2021 Rule Was Arbitrary And Capricious**

The premature withdrawal of the 2021 Rule, which a Federal District Court in this district[3] found violated the APA, extinguished DOL's ability to evaluate the Rule's impact on worker classification. The repeal of the 2021 Rule should be viewed as arbitrary and capricious because its prompt withdrawal precluded the DOL from developing any evidentiary support demonstrating alleged detrimental effects.

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983). There is **no** "evidence before the agency" on whether the 2021 Rule could succeed, so SHRM would be remiss if it did not mention that the rule's withdrawal constitutes arbitrary and capricious agency action. *Id.*

C. **Reality Should Supersede Theory**

The realities of independent work should supersede any theoretical construction of a rule governing worker classification. While basing its multi-factor test on the idea that it encompasses the totality of the circumstance, the on-the-ground realities of independent work are not captured by the 2024 Rule's formulation. For example, the 2024 Rule implies that unexecuted contractual rights may be more important than real-world practices, so even a theoretical job duty existing only on paper can lead to alleged misclassification.

Consideration of the various factors in the 2024 Rule will require HR professionals to speculate on how the DOL or a court may interpret each individual criterion. Courts may be well situated to engage with numerous factors in a *post hoc* analysis of the matters before them, but the

---

[3] See *Coal. for Workforce Innovation v. Walsh* (*CWI*), No. 1:21-CV-130, 2022 WL 1073346, at *19 (E.D. Tex. Mar. 14, 2022)(citation omitted), *vacated as moot on other grounds*, 22-40316 (5th Cir. Feb. 21, 2024).

same is not true of our members, who must make daily and frequent forward-facing decisions on how to classify their workers. The 2024 Rule will result in HR professionals and business executives spending increased time and resources to classify workers while also resulting in potentially more worker misclassification of workers — a setback to inefficiency.

### D. The DOL's Discussion Of, Or "Guidance" On, The Various Factors Inappropriately Tilts the Analysis Toward Employee Classification.

An objective reading of the 2024 Rule demonstrates that its purpose is to push more workers into the "employee" classification, even when that is not what workers want. The 2024 Rule limits workers' right to contract as they choose, even when there is evidentiary support to demonstrate that most independent contractors purposefully decide to engage in these relationships. *See, e.g.*, Bureau of Labor Statistics, Contingent and Alternative Employment Arrangements News Release (May 2017) ("79 percent of independent contractors preferred their arrangement over a traditional job.").

#### 1. *Opportunity for Profit or Loss Depending on Managerial Skill*

The first factor in the 2024 Rule directs courts to consider the opportunity for profit or loss depending on managerial skill, which is to be considered *equally* alongside the other stated factors. The 2021 Rule appropriately designated this as one of two core factors. The prior formulation reflected the modern economy, in which many independent contractors perform knowledge-based jobs that require little investment in materials or equipment.

DOL lists "facts" that "can be relevant" when considering this factor; these "facts" push toward classifying workers as employees and further confuse the classification analysis. The Agency identifies one such fact as "whether the worker makes decisions to hire others, purchase materials and equipment, and/or rent space." 29 CFR 795.110(b)(1). Evaluating material purchases and the need for brick-and-mortar space does not account for the realities of the modern economy when workers can engage from anywhere across the globe with only a phone, tablet, or laptop.

Another fact DOL identifies is "whether the worker accepts or declines jobs or chooses the order and/or time in which the jobs are performed." *Id.* The ability to determine whether, when,

and where to work implies independence and should indicate a contractor relationship. The 2024 Rule confusingly suggests "[s]ome decisions by a worker that can affect the amount of pay that a worker receives, such as the decision to work more hours or take more jobs, generally do not reflect the exercise of managerial skill indicating independent contractor status under this factor." *Id.* Managing the amount of work performed by determining the projects accepted and the time allotted to maximize profit inherently relates to the opportunity for profit and should warrant an independent contractor classification. Requiring our members to make classification decisions based on such vague and confusing factors is arbitrary and capricious.

The economic reality is that a worker who can profit by taking other jobs is more independent —and therefore less economically dependent on the employer — than an employee who cannot. The ability to make that choice should point to an independent relationship. However, the Department's analysis under the 2024 Rule considers this fact to tip the scale toward classifying workers as employees.

2. *Investments by the Worker and the Employer*

Investments were a sub-criterion of the opportunity for profit or loss factor under the 2021 Rule. With this factor now considered separately, and on an equal analytical footing with other factors, DOL suggests that the tools necessary for workers to perform their jobs, including an owned or leased vehicle, do not constitute the kind of "capital or entrepreneurial" investments that "indicate independent contractor status." 2024 Rule at 1676.

Further, the 2024 Rule explains "the worker's investments should be considered on a relative basis with the employer's investments in its overall business." 29 CFR 795.110(b)(2). This interpretation is inconsistent with the Supreme Court's interpretation of the investment factor in *United States v. Silk,* 331 U.S. 704, 716 (1947). When the Supreme Court first addressed the investment factor in *United States v. Silk,* it did so only by reference to the *worker's* investment. 331 U.S. at 716. Indeed, the Court addressed only the fact that workers "own[ed] their trucks" in its analysis, and it engaged in no inquiry as to the investments that the putative employer made in

its own business. *Id.* That, of course, makes sense, as a worker investing in his own equipment is, and should be, a sign of his economic independence.

The 2024 Rule acknowledges that a worker's investment need not be (and rarely ever is) of the same magnitude and scope as the employer's investment. 2024 Rule at 1676-1677. This indicates — again — the rule's predilection for finding an employer-employee relationship. If "worker's investment[s are] . . . rarely of the same magnitude and scope as the employer's," *id.*, then this factor skews toward employment during an analysis of worker classification.[4]

3.  *Degree of Permanence of the Work Relationship*

DOL's current interpretation of the permanence of the work relationship factor does not speak to the independence or voluntariness of the business-worker relationship in any meaningful way. The 2024 Rule instead promotes instability in contracting.

A term of specific duration, whether or not it is continuous with other specific terms, is evidence of independence. A relationship of indefinite duration, however, does not exist simply because parties have continued to contract with each other over a series of defined terms. Indefiniteness is determined by the absence of any term whatsoever. To this end, the 2024 Rule capriciously focuses on the length of the relationship in the discussion of the permanence factor.

The 2024 Rule is also unclear on how courts should resolve the "permanence" issue when a worker and business have a seemingly continuous relationship but the work within that relationship is sporadic. Flexible work within a lengthy relationship is a sign of independence rather than dependence, but the 2024 Rule arbitrarily provides for the converse. The 2024 Rule's focus on permanence undermines the public policy benefits of independent work.

---

[4] SHRM notes that, based on the comments to the NRPM, the DOL "modified the last sentence of the proposed regulatory text for the investments factor to be two sentences, reading: 'The worker's investments need not be equal to the potential employer's investments and should not be compared only in terms of the dollar values of investments or the sizes of the worker and the potential employer. Instead, the focus should be on comparing the investments to determine whether the worker is making similar types of investments as the potential employer (even if on a smaller scale) to suggest that the worker is operating independently, which would indicate independent contractor status.'" The DOL claims this "modification should address commenters' concerns that the size of and/or dollar investments of the employer will determine the outcome when comparing the investments." But the 2024 Rule still directs HR Professionals to consult the value of an employee's investment versus the alleged employer, which will almost always point to an employee classification, once again demonstrating the Rule's predeliction for employee classifications.

4. *Nature and Degree of Control*

The 2024 Rule demotes the nature and degree of control exercised by the hiring entity – perhaps the most telling factor in evaluating worker classification – from a core consideration of the 2021 Rule to equal footing with other previously subordinate factors. This is certain to lead to confusion.

The 2024 Rule adopts an antiquated view of economic independence in its consideration of a worker's ability to work for others under the control factor. The 2024 Rule suggests that a worker who "holds multiple lower-paying jobs for which they are dependent on each employer for work to earn a living" resembles an employee, whereas a worker who works multiple jobs "due to their business acumen and entrepreneurial skills" is more akin to an independent contractor. 2024 Rule at 1704.

However, low-wage earners may, in fact, *gain* independence by maintaining the flexibility to work with multiple hiring entities. Indeed, contract work may provide these workers with control over their schedules, offering the ability to maximize their earnings and better attend to their personal obligations. The 2024 Rule hinders that contractual freedom.

The 2024 Rule improperly repudiates the 2021 Rule's de-emphasis on whether a company requires a service provider to comply with legal and safety standards, to carry insurance, or to meet contractually agreed-upon deadlines or quality control standards. 2024 Rule at 1694 ("[A] potential employer's control over compliance methods, safety, quality control, or contractual or customer service standards that goes beyond what is required by specific, applicable Federal, State, Tribal, or local law or regulation may in some – but not all – cases be relevant to the analysis of a potential employer's control if it is probative of a worker's economic dependence."). It makes little sense that a company paying for a specific service could not communicate its expectations to a service provider without running the risk of a misclassification finding. Moreover, requiring service providers to comply with legal and safety obligations, as well as to maintain insurance, is not a manifestation of control.

Companies are obligated, legally as well as ethically, to maintain a safe working environment that ensures the health of their employees, their partners, and their customers. The 2024 Rule will deter some companies from meeting their obligations in this respect by holding the specter of misclassification over their heads for simply trying to do right by the independent workers who make their businesses viable. While this consequence may have been unintended or unanticipated, it will impact businesses and workers in reality.

5.  *Integral Part of the Employer's Business*

Employers and HR professionals were surprised by the inclusion of this factor in the 2022 NPRM. The extent to which the work performed is an integral part of the hiring entity's business is, for all intents and purposes, Prong B of the ABC test, which relevant DOL leaders[5] have noted cannot be mandated without congressional action.

The analysis accompanying the 2021 Rule deemed whether the work performed is integral to the hiring entity's business to be a superfluous factor. 2024 Rule at 62253 n.432 (quoting *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987) (Easterbrook, J. concurring) ("[e]verything the employer does is 'integral' to its business – why else do it?"). The reason for this is plain. As a general rule, companies hesitate to engage workers to provide services that are *not* "critical, necessary, or central" to their businesses. The fact that a company has decided to allocate resources to pay for a worker's services confirms the value of the worker's services to the company. That is not necessarily indicative of employment status, however.

Here, the 2024 Rule departs from years of precedent by shifting the focus of the classification determination from the extent to which a worker is actually *integrated* into a company's business to the nature of the services performed by the worker.

---

[5] At her appearance before the House Education and the Workforce Committee on May 31, 2023, acting Secretary of Labor Julie Su stated that "AB 5 is not federal law. It would only be federal law if Congress decides that it should be." President Biden's then nominee for administrator of the U.S. Department of Labor's Wage and Hour Division, Jessica Looman, at a hearing before the Committee on Health, Education, Labor and Pension stated that "[t]he Wage and Hour Division and the Department of Labor do not have the authority to adopt by regulation the ABC test, unless it's changed by Congress."

15

The U.S. Supreme Court's decision in *Rutherford* is instructive. There, the Court held that meat boners at a meat processing plant were employees based not on the fact that their work was closely related to the company's primary business, but rather because of "the circumstances of the whole activity." *Rutherford*, 331 U.S. at 730-731. The evidence showed that the company closely supervised the boners, that the boners performed tasks in concert with the company's employees, and that the boners utilized the company's premises and equipment to perform their work. *Id.* In other words, the boners were so integrated into the company's operations as to nullify their contractor designation. *See id.* The *Rutherford* Court focused on the fact that the boners' services were intertwined with the company's operations, not on the degree to which their services were related to the company's ultimate profit-generating activities.

HR professionals are well-equipped to assess the extent to which a worker is integrated into a company's operations based on the common-sense framework set forth in *Rutherford* and its progeny, to which the 2021 Rule adhered. On the other hand, the 2024 Rule will require HR professionals to speculate as to whether a worker's services are "critical, necessary, or central" to the business, regardless of the circumstances of the work being performed. It is not difficult to foresee that HR professionals, particularly those in large, multi-faceted organizations, will be bogged down in this assessment if the 2024 Rule remains law.

  6. *Skill and Initiative*

The 2024 Rule purports to convert a standard consideration utilized by myriad independent contractor classification tests – the degree of skill required by the work – into an assessment of a worker's business acumen. This is not only a drastic departure from a well-settled standard, but it also negates the 2024 Rule's decree that a worker's *opportunity* for profit or loss based on their managerial skill is relevant to their classification as an employee or an independent contractor.

  7. *Additional Factors*

The 2024 Rule puts unknown "additional factors" on equal analytical footing as the other, more well-established factors – such as control. The inclusion of a catchall confirms the serious lack of clarity inherent to the 2024 Rule. *See* 2024 Rule at 1717 ("[T]o assign a predetermined and

immutable weight to certain factors ignores the totality-of-the-circumstances, fact-specific nature of the inquiry that is intended to reach a multitude of employment relationships across occupations and industries and over time"). Providing such vague, ill- or un-defined "additional factors" equal weight as the more established criteria creates a greater risk of inconsistency in how the rule will be interpreted by SHRM's members, other employers, enforcement agencies, and the courts.

### E. The 2024 Rule Is Less Certain Than The Pre-2021 Rule

The 2024 Rule's framework imposes an unweighted, vague, multi-factor balancing test that depends on the unlimited minutiae of individual circumstances, as well as the various interpretations of stakeholders from workers to businesses and from the DOL and to the courts. Even the standard effective prior to 2021 provided those tasked with rendering these decisions with better guidance and some clarity concerning the weight to be afforded each factor.

Specifically, the 2024 Rule's "totality of the circumstances" framework is even more uncertain than the "economic realities" framework of the rule prior to 2021. The 2024 Rule permits — even requires — broad consideration of multiple facts across indistinct factors without guidance on how that analysis should occur to appropriately identify and weigh each criterion in the final analysis.

Prior to 2021, numerous courts provided guidance that certain economic realities factors are entitled to greater weight than others, including, specifically, the general right of control factor and the opportunity for profit or loss factor. *See, e.g.*, *Walsh v. Med. Staffing of Am., LLC*, 580 F. Supp. 3d 216, 229 (E.D. Va. 2022) ("The degree of control a putative employer has over the way an alleged employee's work is performed is the 'most important factor' in making this determination." (quoting *Smith v. CSRA*, 12 F.4th 396, 413 (4th Cir. 2021))); *Brown v. BCG Attorney Search*, No. 12 C 9596, 2013 WL 6096932, at *1 (N.D. Ill. Nov. 20, 2013) ("Although several factors are considered in determining whether an individual is an employee or an independent contractor, the employer's right to control is the most important in making the distinction."); *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1469 (C.D. Cal. 1996) ("Ultimately Plaintiffs' most important allegation is that Defendants 'directly employed plaintiffs . . . and

17

exercised meaningful control over the work performed."). Under the 2024 Rule, conversely, every factor must be given equal weight, including the un-defined "additional factors."

V.

## CONCLUSION

For the reasons set forth above, SHRM urges the Court to adopt the position advocated by CWI in the underlying litigation: That not only does the new rules violate the APA procedurally, but it is also substantively deficient. Additionally, the 2024 Rule, unlike the 2021 Rule, or even the standard prior to the promulgation of the 2021 Rule, leaves SHRM members in an analytical quagmire. Instead of offering a rope to guide the necessary worker classification decision, the 2024 Rule pushes the analysis further into uncertainty.

DATED: April 25, 2024

Respectfully submitted,

By: /s/ Linda C. Schoonmaker
LINDA C. SCHOONMAKER
State Bar No. 17806300
lschoonmaker@seyfarth.com
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 225-2300
Facsimile: (713) 225-2340

**ATTORNEY FOR THE SOCIETY FOR HUMAN RESOURCE MANAGEMENT**

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2024, the foregoing was electronically filed with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record:

/s/ Linda C. Schoonmaker
Linda C. Schoonmaker

18

310609877v.1