IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

COALITION FOR WORKFORCE
INNOVATION, *et al.*,

        Plaintiffs,

    v.

JULIE A. SU, *et al.*,

        Defendants.

Case No. 21-CV-00130-MAC

BRIEF OF *AMICI CURIAE*
AMERICAN HOTEL & LODGING ASSOCIATION;
ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC.;
SMALL BUSINESS AND ENTREPRENEURSHIP COUNCIL;
ASSOCIATION OF BI-STATE MOTOR CARRIERS, INC.;
AMERICAN BAKERS ASSOCIATION;
INDEPENDENT ELECTRICAL CONTRACTORS;
NATIONAL ASSOCIATION OF CONVENIENCE STORES; AND
NATIONAL ASSOCIATION OF REALTORS® IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAUL DECAMP
   (*pro hac vice motion forthcoming*)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com

GRETA RAVITSKY
   Texas Bar No. 24058063
   *Lead Attorney*
EPSTEIN, BECKER & GREEN, P.C.
700 Louisiana Street, Suite 3950
Houston, Texas  77002
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

*Counsel for* Amici Curiae

## TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* ........................................................................ 1

INTRODUCTION ANDSUMMARY OF ARGUMENT ................................................ 2

ARGUMENT ........................................................................................................... 4

I.    THE 2024 RULE IS INVALID AND UNWORTHY OF DEFERENCE BECAUSE
      IT FAILS TO PROVIDE FAIR NOTICE OF THE CONDUCT NECESSARY TO
      AVOID LIABILITY. ........................................................................................... 4

II.   THE 2024 RULE IS INVALID AND UNWORTHY OF DEFERENCE BECAUSE
      IT IS MERELY A SLANTED GLOSS ON THE CASE LAW, RATHER THAN A
      REASONED INTERPRETATION OF STATUTORY TEXT. ........................................ 10

III.  THE COURT SHOULD BE ESPECIALLY SKEPTICAL WHERE, AS HERE, AN
      AGENCY'S PREFERRED INTERPRETATION HAPPENS TO CONFER UPON
      THE AGENCY MAXIMUM ENFORCEMENT POWER. ............................................. 13

CONCLUSION ....................................................................................................... 15

CERTIFICATE OF SERVICE ................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Career Colleges & Schools of Texas v. Department of Education*,
— F.4th—, No. 23-50491, 2024 WL 1461737 (Apr. 4, 2024) ................ 3, 5, 6, 9

*CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439 (5th Cir. 2024) ................................ 3, 4

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
467 U.S. 837 (1984) ........................................................... 10, 13, 14, 15

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .................................................. 4, 13, 15

*Diamond Roofing Co. v. OSHRC*, 528 F.2d 645 (5th Cir. 1976) ............................. 4, 5

*Employer Solutions Staffing Group II, L.L.C. v. Office of the Chief
Administrative Hearing Officer*,
833 F.3d 480 (5th Cir. 2016) ..................................................... 3, 10, 13

*ExxonMobil Pipeline Co. v. Department of Transportation*,
867 F.3d 564 (5th Cir. 2017) ............................................................ 4, 5

*Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016) ............ 10, 11, 12

*Jacobellis v. Ohio*, 378 U.S. 184 (1964) ........................................................... 7

*Loper Bright Enterprises v. Raimondo*,
No. 22-451 (U.S. argued Jan. 17, 2024) ........................................... 15

*Macktal v. Department of Labor*, 171 F.3d 323 (5th Cir. 1999) ................................ 10

*New York v. Shalala*, 119 F.3d 175 (2d Cir. 1997) ...................................... 11

*Relentless, Inc. v. Department of Commerce*,
No. 22-1219 (U.S. argued Jan. 17, 2024) ........................................... 15

*SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017) ..................... 4

*Wages & White Lion Investments v. FDA*,
90 F.4th 357 (5th Cir. 2024) (en banc) ....................................... 3, 4, 5

*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947) ............................................ 11

*Willy v. Administrative Review Board*, 423 F.3d 483 (5th Cir. 2005)................... 3, 10

STATUTES AND CONSTITUTIONAL PROVISIONS

United States Constitution, amendment V ..................................................... 4

Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201-19
................................................................... 3, 7, 8, 10, 14, 15

    Section 3(d), 29 U.S.C. § 203(d) ........................................................ 12

    Section 3(e)(1), 29 U.S.C. § 203(e)(1) ........................................... 11, 12

    Section 3(g), 29 U.S.C. § 203(g) ....................................................... 12

    Section 16(b), 29 U.S.C. § 216(b) ....................................................... 8

    Section 16(c), 29 U.S.C. § 216(c) ....................................................... 7

    Section 16(e)(2), 29 U.S.C. § 216(e)(2) ............................................... 7

Federal Civil Penalties Inflation Adjustment Act Improvements Act of
    2015, Pub. L. 114-74, § 701............................................................... 7

Higher Education Act, section 455(h), 20 U.S.C. § 1087e(h) ......................... 5

Portal-to-Portal Act of 1947, as amended, section 10, 29 U.S.C. § 259 ...................... 8

RULES AND REGULATIONS

Code of Federal Regulations, Title 29

    Section 795.110(a)(2)............................................................................ 6

    Section 795.110(a)(7)............................................................................ 6

Employee or Independent Contractor Classification Under the Fair Labor
    Standards Act, 89 Fed. Reg. 1,638 (Jan. 10, 2024)
................................................................2, 3, 4, 6, 9, 10, 11, 12, 14, 15

Employee or Independent Contractor Classification Under the Fair Labor
    Standards Act, 87 Fed. Reg. 62,218 (Oct. 13, 2022) ......................................... 12

OTHER AUTHORITIES

Adam Ozimek, *Freelance Forward Economist Report* (2021),
    https://www.upwork.com/research/freelance-forward-2021 ............................. 9

Colin Roskey & Tamara Tenney, *HHS Stakeholder Rights in an Era of
    Statutory Entrenchment and Agency Overreach*, 18 DEPAUL J.
    HEALTH CARE L. 79 (2016) ............................................................................. 13

MBO Partners, *Stronger Together: State of Independence in America 2023*
    (2023), https://www.mbopartners.com/state-of-independence/ ........................ 9

Nathan Alexander Sales, *The Rest Is Silence:* Chevron *Deference, Agency
    Jurisdiction, and Statutory Silences*, 2009 U. ILL. L. REV. 1497
    (2009) ............................................................................................................. 14

Sarah Zeleznikow, *"Leaving the Fox in Charge of the Hen House": Of
    Agencies, Jurisdictional Determinations and the Separation of
    Powers*, 71 N.Y.U. ANN. SURV. AM. L. 275, 279 (2016) .................................... 14

Timothy K. Armstrong, Chevron *Deference and Agency Self-Interest*, 13
    CORNELL J.L. & PUB. POL'Y 203 (2004) ............................................................ 14

United States Department of Labor, Wage and Hour Division

    Opinion Letter FLSA2021-8 (Jan. 19, 2021),
        https://www.dol.gov/agencies/whd/opinion-
        letters/search?FLSA .................................................................................. 8

    Opinion Letter FLSA2021-9 (Jan. 19, 2021),
        https://www.dol.gov/agencies/whd/opinion-
        letters/search?FLSA .................................................................................. 8

    https://www.dol.gov/agencies/whd/resources/penalties ..................................... 7

## INTEREST OF THE *AMICI CURIAE*

The American Hotel & Lodging Association is the largest hotel association in the United States representing all segments of the industry nationwide including major chains, independent hotels, management companies, REITs, bed and breakfasts, industry partners, and more.  It has over 32,000 member properties, including the ten largest hotel companies in the country.

The Associated General Contractors of America, Inc. is a leading trade association in the construction industry, representing more than 27,000 member firms, including 7,000 of the country's leading general contractors, nearly 9,000 specialty contracting firms, and more than 11,000 service providers and suppliers, engaged in building, heavy, civil, industrial, utility, and other construction disciplines for both public and private property owners and developers.

The Small Business and Entrepreneurship Council is an advocacy, research, and education group working to promote entrepreneurship and to protect small-business vitality and growth.  For more than 30 years, it has promoted innovative initiatives and policies to enable startup activity, small-business competitiveness, and a policy ecosystem that lowers barriers to entrepreneurial opportunity and success.

The Association of Bi-State Motor Carriers, Inc. is an organization whose 170 motor carrier member firms, located throughout the United States and Canada, are responsible for moving a majority share of port and container traffic at the Port of New York-New Jersey, and more than 80% of the port and container traffic at Port Newark.

The American Bakers Association is the largest, most established, and diverse trade association for the commercial baking industry in the United States.  Its community includes more than 300 member companies representing over 1,200 commercial baking facilities and the extensive industry supply chain.

Independent Electrical Contractors is the nation's premier trade association representing America's independent electrical and systems contractors with over 50 chapters, representing 3,700 member companies that employ more than 80,000 electrical and systems workers throughout the United States.  It aggressively works with the industry to promote the concept of free enterprise, open competition, and economic opportunity for all.

The National Association of Convenience Stores is a trade association with more than 1,300 retail and 1,600 supplier company members in the United States and abroad.  It is the preeminent representative of the interests of convenience store operators.  Its members operate more than 152,000 convenience stores worldwide.

The National Association of REALTORS® is the country's largest trade association, representing more than 1.5 million members through approximately 1,200 state and local associations.  Its members comprise residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others, involved in all aspects of the residential and commercial real estate industries.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The regulation at issue, Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1,638 (Jan. 10, 2024) (the "2024

Rule"), is contrary to law and entitled to no deference by this Court.  The 2024 Rule fails for at least three reasons.

First, the regulation fails to provide "fair notice" of the conduct necessary to avoid liability, including civil money penalties.  *See, e.g.*, *CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 444 (5th Cir. 2024); *Wages & White Lion Invs. v. FDA*, 90 F.4th 357, 374 (5th Cir. 2024) (en banc).  Instead, the rule's impossibly vague standards allow "the Department to terrify first and clarify later."  *Career Colleges & Sch. of Tex. v. Dep't of Educ.*, — F.4th—, No. 23-50491, 2024 WL 1461737, *17 (Apr. 4, 2024). Such a rule cannot stand.

Second, the 2024 Rule does not derive from a reasoned analysis of statutory text and legislative intent, as informed by agency experience—the kind of endeavor that if done reasonably might garner respect from the Court.  Instead, the Department candidly acknowledges that it has engaged in an exercise of pulling quotes from court rulings, which receives no deference at all.  *See, e.g.*, *Employer Solutions Staffing Grp. II, L.L.C. v. Office of the Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016); *Willy v. Admin. Review Bd.*, 423 F.3d 483, 490 (5th Cir. 2005).  In the end, the 2024 Rule is little more than an amicus brief that selectively reviews the case law and cherry-picks the sound bites the Department prefers, while often ignoring the broader context of the cited decisions.

Third, the regulation raises the particularly troubling specter of agency self-aggrandizement.  Under the Fair Labor Standards Act (the "FLSA"), the Department has no authority to regulate in the absence of an employment relationship between

an employer and an employee.  Yet the 2024 Rule gives the Department the broadest conceivable power to assert FLSA coverage.  As Chief Justice Roberts has cautioned, "[w]e do not leave it to the agency to decide when it is in charge." *City of Arlington v. FCC*, 569 U.S. 290, 327 (2013) (Roberts, C.J., dissenting).

## ARGUMENT

## I.   THE 2024 RULE IS INVALID AND UNWORTHY OF DEFERENCE BECAUSE IT FAILS TO PROVIDE FAIR NOTICE OF THE CONDUCT NECESSARY TO AVOID LIABILITY.

"The fair notice doctrine is a 'basic principle of administrative law.'" *CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 444 (5th Cir. 2024) (reversing judgment entered against regulated entity due to lack of fair notice that the defendant's conduct violated a regulatory provision) (quoting *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017)).  "The agency 'must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents.'" *Id.* (quoting *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)). Where there is an "absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability."  *Id.* (quoting *ExxonMobil Pipeline Co. v. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (cleaned up)).

"At its core, the [fair notice] doctrine requires administrative agencies to give the public fair notice of their rules before finding a violation of them." *Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 374 (5th Cir. 2024) (en banc) (overturning agency determination due to lack of fair notice).  This "doctrine is rooted in the Fifth

Amendment's Due Process Clause" and, while originating in the context of criminal law, "also applies more broadly to civil administrative proceedings." *Id.* at 374-75. The Fifth Circuit "ha[s] warned that fair notice requires the agency to have 'state[d] with ascertainable certainty what is meant by the standards [it] has promulgated.'" *ExxonMobil*, 867 F.3d at 578 (quoting *Diamond Roofing*, 528 F.2d at 649).

In April of this year, the Fifth Circuit noted the harms that result when an agency issues vague guidance. In *Career Colleges and Schools of Texas v. Department of Education*, — F.4th—, No. 23-50491, 2024 WL 1461737 (Apr. 4, 2024), an association of schools challenged regulations by the Department of Education relating to student loan discharges. The rule at issue—like the one currently before this Court— "overturns recent regulations issued by the previous Administration[.]" *Id.* at *1. The district court declined to issue a preliminary injunction, and the Fifth Circuit reversed, concluding that the plaintiff demonstrated a strong likelihood of success.

The court "h[e]ld that the Rule's standards for actionable misrepresentations or omissions or aggressive or deceptive recruiting tactics most likely do not comply with the specificity requirement of Section 455(h)" of the Higher Education Act, 20 U.S.C. § 1087e(h). 2024 WL 1461737 at *17. "The statute does not permit the Department to promulgate vague standards full of non-exclusive examples and undefined terms." *Id.* The court noted that "[t]he unbridled scope of these prohibitions enables the Department to hold schools liable for conduct that it defines only with future 'guidance' documents or in the court of adjudication. ***Simply put, the statute***

5

***does not permit the Department to terrify first and clarify later.***" *Id.* (emphasis added).

The 2024 Rule poses all of these same risks, and more.  The rule declares that "[t]he Act's definitions are meant to encompass as employees all workers who, as a matter of economic reality, are economically dependent on an employer for work."  89 Fed. Reg. at 1742 (text of 29 C.F.R. § 795.105(b)).  The rule then proceeds to list six factors that "should guide an assessment of the economic realities" under a "totality-of-the-circumstances analysis" in which "no one factor or subset of factors is necessarily dispositive, and the weight to give each factor may depend on the facts and circumstances of the particular relationship."  *Id.* (text of 29 C.F.R. § 795.110(a)(2)).  The rule's multi-factor, totality-of-the-circumstances approach described above would pose problems as-is, but the Department doubles down on this ambiguity by further noting that "these six factors are not exhaustive" and that undefined "[a]dditional factors may be relevant[.]"  *Id.* at 1742-43 (text of 29 C.F.R. § 795.110(a)(2), (a)(7)).

Unfortunately, and predictably, the net result of the Department's regulation is that except in the clearest of cases, where every single factor points in one direction—i.e., either toward or away from employee status—and there are no "additional" relevant factors in play, determining whether a particular worker is or is not an employee is essentially a guessing game and an exercise in risk tolerance.  For factual situations anywhere within the exceptionally large gray zone of legal ambiguity this rule creates, the legal status of the worker is both a mystery novel, where the answer remains hidden until the surprise revelation at the end, and a Rorschach test, where

6

what one sees depends largely on who exactly is doing the seeing.  This approach to rulemaking brings to mind Justice Stewart's infamous "I know it when I see it" standard, which of course is no standard at all.  *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

Thus, under the Department's regulation, the only clear options to comply and to avoid liability under the FLSA are (1) not to use the services of the worker in the first place or (2) to treat the worker as an employee even though he or she may not be one under the statute.  This is at best a Hobson's choice.  Countless times each day across the country, a business will identify another business, through internet research or otherwise, and enter into what it understands to be an arm's-length commercial transaction for services.  Yet the entire structure of that arrangement is subject to second-guessing if the Department later decides that the contract represents too large a share of the contractor's revenue, thereby rendering the service provider "economically dependent" on the other business.

And the concern about the consequences of the Department's approach is not limited to the Department's own enforcement proceedings, in which the FLSA authorizes both litigation, *see* 29 U.S.C. § 216(c), and, in many circumstances, civil money penalties.  *See* 29 *id.* § 216(e)(2) (specifying penalty of up to $1,100 per affected worker for repeated or willful violations of the minimum wage or overtime provisions, which becomes $2,451 in light of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, § 701); https://www.dol.gov/agencies/whd/resources/penalties.  Instead, because the FLSA also authorizes private

7

enforcement, *see* 29 U.S.C. § 216(b), the Department's ambiguous non-standard invites costly private lawsuits with unknowable outcomes.

Nor is there any meaningful way to obtain the Department's views on a worker's classification before a dispute arises.  In years past, one could submit a request for an opinion letter to the Administrator of the Department's Wage and Hour Division, and in the early days of the agency one would expect to receive a response—one that carries the force of law and provides a defense in subsequent litigation, *see* 29 U.S.C. § 259—within a matter of a few weeks or months.  Those days, however, are long gone.  By the late 2000s, the time to receive a response had extended to years, not months.  During the Obama Administration, the Wage and Hour Division stopped issuing opinion letters altogether.  During the Trump years, the agency issued a few opinion letters, but that avenue for guidance has dried up during the current administration, which as of this writing has not yet issued a single opinion letter interpreting the FLSA.  Indeed, heaping insult upon injury, the current administration actually *withdrew* two opinion letters issued by the previous administration that provided much-needed guidance as to the status of tractor-trailer truck drivers and food product distributors.  *See* https://www.dol.gov/agencies/whd/opinion-letters/search?FLSA (noting withdrawal of opinion letters FLSA2021-8 and FLSA2021-9).

In many of today's industries, large numbers of workers occupy an independent contractor role.  Examples abound: information technology consulting, rideshare services, meal delivery, insurance sales, freight shipment, and many more.  Within the real estate sector, for example, independent contractors represent approximately 89%

of the membership of the National Association of REALTORS®.  In these industries, the viability of the entire business model often hinges on that classification; the model may be profitable and manageable as a non-employee structure, whereas it may be unprofitable and unmanageable as an employee structure.

Particularly with the emergence of the gig economy and what are often strong worker preferences for flexible business arrangements outside an employer/employee construct, the value of classifying workers as independent contractors rests not just with the businesses, but with the workers themselves.  According to one recent analysis, "[i]n 2023, 77% of independent workers reported being very satisfied with independent work, and 78% plan to continue as an independent worker (59%) or build a bigger independent business (19%)."  MBO Partners, *Stronger Together: State of Independence in America 2023* (2023), https://www.mbopartners.com/state-of-independence/ (under "Highly Satisfied" tab); *see also* Adam Ozimek, *Freelance Forward Economist Report* (2021), https://www.upwork.com/research/freelance-forward-2021 ("78% of skilled remote freelancers cite 'schedule flexibility' as a key reason for freelancing" while "68% of new freelancers say that 'Career Ownership' is a top draw").  It is unreasonable and, frankly, unconscionable that the Department would leave businesses and workers with so little guidance on this critical threshold statutory issue of who is and is not an employee, and potentially force significant reclassification against the wishes of workers.

In short, the 2024 Rule creates exactly the kind of "terrify first and clarify later" dynamic that the Fifth Circuit just rejected.  *See Career Colleges*, 2024 WL

1461737 at *17.   The regulation is, in reality, not a rule at all.  It provides no pre-dictability with respect to any even mildly debatable fact scenario.  The public de-serves much better guidance than what amounts to "roll the dice and see what hap-pens in court."  The 2024 Rule fails to provide fair notice, or indeed any meaningful notice, to the regulated community, and is thus invalid and entitled to no deference.

## II.   THE 2024 RULE IS INVALID AND UNWORTHY OF DEFERENCE BECAUSE IT IS MERELY A SLANTED GLOSS ON THE CASE LAW, RATHER THAN A REASONED INTERPRETATION OF STATUTORY TEXT.

The rationale for deferring to agency determinations under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), is that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]"  *Id.* at 844.  But for *Chevron* to apply, the agency must, in fact, construe the statutory scheme.  By contrast, "an agency's inter-pretations of caselaw are reviewed *de novo*" and receive no deference whatsoever.  *Employer Solutions Staffing Grp. II, L.L.C. v. Office of the Chief Admin. Hearing Of-ficer*, 833 F.3d 480, 484 (5th Cir. 2016); *see also Willy v. Admin. Review Bd.*, 423 F.3d 483, 490 (5th Cir. 2005); *Macktal v. Dep't of Labor*, 171 F.3d 323, 326 (5th Cir. 1999).

In a strikingly similar case, involving the Department of Labor and a different attempt to define who is and is not an "employee," the Second Circuit rejected the Department's approach and gave it no deference.  In *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016), former interns in the motion picture industry sued entertainment companies alleging that they were actually employees under the FLSA who should have received minimum wage and overtime.  *Id.* at 531-32.  To support

their claims, the interns relied on a fact sheet the Department issued purporting to set forth six factors to differentiate properly unpaid interns from employees, with those factors drawn from the Supreme Court's decision in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947). *See Glatt*, 811 F.3d at 534-35. The district court granted partial summary judgment in favor of the interns and certified a state-law class and a nationwide collective action, and the studios successfully petitioned for interlocutory review. *Id.* at 533.

On appeal, the Second Circuit took issue with the Department's fact sheet. "We decline DOL's invitation to defer to the test laid out in the Intern Fact Sheet. As DOL makes clear in its brief, its six-part test is essentially a distillation of the facts discussed in *Portland Terminal*." *Glatt*, 811 F.3d at 536. But "[u]nlike an agency's interpretation of ambiguous statutory terms or its own regulations, 'an agency has no special competence or role in interpreting a judicial decision." *Id.* (quoting *N.Y. v. Shalala*, 119 F.3d 175, 180 (2d Cir. 1997)). The court then set forth its own standard, which differed from the Department's approach, and vacated the district court's rulings and remanded the matter. *Id.* at 536-37, 541.

With the 2024 Rule, the Department did virtually the same thing it did in *Glatt*; it assembled a standard for differentiating employees from non-employees based not on statutory text, legislative history, or agency experience, but instead on what *courts* had said about the issue. Indeed, there is almost no pertinent statutory text for the agency to construe. Section 3(e)(1) of the FLSA provides that, subject to certain exceptions, "the term 'employee' means any individual employed by an

11

employer."  29 U.S.C. § 203(e)(1).  According to section 3(g), "'[e]mploy' includes to suffer or permit to work."  *Id.* § 203(g).  And under section 3(d), "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization."  *Id.* § 203(d).  The entire construct is recursive, illusive, and confounding, a Cheshire cat riding a Möbius strip.  Nor does the legislative history shed any relevant light on these terms.

So, with nothing in the statute to go on, the Department once again turned to the case law.  The 2024 Rule, like the notice of proposed rulemaking that preceded it, Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 87 Fed. Reg. 62,218 (Oct. 13, 2022), drew its substance from numerous court rulings and agency guidance documents based on those same court rulings.  *See, e.g.*, 89 Fed. Reg. at 1,640-44, 1,650-52, 1,664-71, 1679-80, 1,690-1,721 (final rule); 87 Fed. Reg. at 62,220-31, 62,234-58 (proposed rule).  As even a cursory reading of the proposed and final rules makes clear, the Department did not interpret the *statute* in the 2024 Rule, but instead cobbled together a standard pieced together from a selective reading of what the courts have said.  What the Department published in the Federal Register reads much more like an amicus brief than an attempt to interpret ambiguous statutory language.

Because the Department "has no special competence or role in interpreting . . . judicial decision[s]," *see Glatt*, 811 F.3d at 536, the 2024 Rule—which is at its core an

agency interpretation of judicial decisions—is entitled to no deference in this Court.

*See Employer Solutions*, 833 F.3d at 484.

## III.   THE COURT SHOULD BE ESPECIALLY SKEPTICAL WHERE, AS HERE, AN AGENCY'S PREFERRED INTERPRETATION HAPPENS TO CONFER UPON THE AGENCY MAXIMUM ENFORCEMENT POWER.

In 2013, the Supreme Court determined that *Chevron* deference extends to agency interpretations of their own regulatory authority.  *City of Arlington v. FCC*, 569 U.S. 290, 301-02 (2013).  That decision, however, drew the strong dissent of Chief Justice Roberts, joined by Justices Kennedy and Alito.  "An agency cannot exercise interpretive authority until it has it; the question whether an agency enjoys that authority must be decided by a court, without deference to the agency."  *Id.* at 312 (Roberts, C.J., dissenting).  The Chief Justice warned that "[a]n agency's interpretive authority, entitling the agency to judicial deference, acquires its legitimacy from a delegation of lawmaking power from Congress to the Executive."  *Id.* at 327.  Thus, "[i]n the present context, that means ensuring that the Legislative Branch has in fact delegated lawmaking power to an agency within the Executive Branch, before the Judiciary defers to the Executive on what the law is."  *Id.*  Stated differently, "[w]e do not leave it to the agency to decide when it is in charge."  *Id.*

Numerous commentators over the years have expressed similar concern about agencies overreaching and exceeding their proper authority, particularly when interpreting the scope of their own power.  "Worries about potential agency self-aggrandizement have existed perhaps as long as executive agencies themselves."  Colin Roskey & Tamara Tenney, *HHS Stakeholder Rights in an Era of Statutory Entrenchment*

*and Agency Overreach*, 18 DEPAUL J. HEALTH CARE L. 79, 82-86 (2016).  Another author argues that "traditional justifications" for deference "should be viewed as having been eclipsed by the novel concerns that arise from the potential for agency bias or self-aggrandizement in the jurisdictional determination sphere."  Sarah Zeleznikow, *"Leaving the Fox in Charge of the Hen House": Of Agencies, Jurisdictional Determinations and the Separation of Powers*, 71 N.Y.U. ANN. SURV. AM. L. 275, 279 (2016).  *See also* Nathan Alexander Sales, *The Rest Is Silence:* Chevron *Deference, Agency Jurisdiction, and Statutory Silences*, 2009 U. ILL. L. REV. 1497,  1564-65 (2009) (pre-*Arlington* article arguing that "courts must answer the threshold jurisdictional questions on their own, without letting agencies do their dirty work for them" and that "denying *Chevron* deference on jurisdictional questions would . . . frustrate imperial agencies' ambitions to accumulate more and more power"); Timothy K. Armstrong, Chevron *Deference and Agency Self-Interest*, 13 CORNELL J.L. & PUB. POL'Y 203, 207 (2004) (pre-*Arlington* article arguing that "the preferable analytical approach would be to evaluate claims that an agency has acted in a self-aggrandizing manner entirely outside the scope of the *Chevron* doctrine" and that instead "a court confronted with an arguably self-interested agency interpretation of law should evaluate the agency's interpretation *de novo*").

As discussed above, the 2024 Rule arrogates to the Department the authority to investigate and to drag into court any business that engages with workers for whom even *one* factor points toward employee status, and to encourage private litigants to do the same.  Nothing in the text or legislative history of the FLSA warrants

14

such a sweeping grant of raw power, including the power to bully businesses into settlements, to the Department.

*Arlington* is still binding law, for now, and *amici* are in no way suggesting that the Court should deviate from controlling precedent.  However, in the coming weeks the Supreme Court is likely to rule in two pending cases—*Relentless, Inc. v. Department of Commerce* (No. 22-1219), argued on January 17, 2024 along with *Loper Bright Enterprises v. Raimondo* (No. 22-451)—presenting the question whether to overrule, or at least to curtail, *Chevron*.  In the event that the Supreme Court diminishes *Chevron*, that development would in turn open the door for this Court to be duly wary of the Department's exceedingly broad reading of its own authority under the FLSA.

## CONCLUSION

For these reasons, the 2024 Rule is invalid, and *amici curiae* urge the Court to grant Plaintiffs' motion for summary judgment, Dkt. 52.

Respectfully submitted,

/s/ Greta Ravitsky

PAUL DECAMP
  (*pro hac vice motion forthcoming*)
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W., Suite 700
Washington, D.C.  20037
Tel:  202.861.1819
Fax: 202.861.3571
PDeCamp@ebglaw.com

GRETA RAVITSKY
  Texas Bar No. 24058063
  *Lead Attorney*
EPSTEIN, BECKER & GREEN, P.C.
700 Louisiana Street, Suite 3950
Houston, Texas  77002
Tel:  713.300.3215
Fax: 713.300.3235
GRavitsky@ebglaw.com

*Counsel for* Amici Curiae

April 26, 2024

15

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the foregoing document was electronically filed in this matter with the Clerk of Court, using the ECF system, which sent notification of such filing to all counsel of record.

/s/ Greta Ravitsky
Greta Ravitsky

April 26, 2024